AMERICAN CYANAMID COMPANY, PROSECUTOR, v.
ELIZABETH BORTOS, RESPONDENT.

Argued October 4, 1943—Decided March 29, 1944.

Before BROGAN, CHIEF JUSTICE, and Justices BODINE and
COLIE.

For the prosecutor, *Pitney, Hardin & Ward* (*Shelton Pitney*, of counsel).

For the respondent, *Mario Turtur*.

The opinion of the court was delivered by

COLIE, J.  Elizabeth Bortos filed a petition in the Workmen's Compensation Bureau to recover compensation for the death of her husband, Paul Bortos.  The Bureau made an award on September 8th, 1937, and found that the decedent "contracted a compensable occupational disease included in Paragraph 22 (b) of Chapter 95, *Pamph. L.* 1911, as amended, to wit, a compensable occupational disease included in the classification of benzene, its homologues and all derivatives thereof."  From this decision the respondent appealed to the Union County Court of Common Pleas, which found that the decedent "met his death as a result of poisoning from exposure to Di-Ortho-Tolyl-Guanidine, a derivative of benzene and its homologues, within the meaning and as defined by the Workmen's Compensation Act, *R. S.* 34:15–31."  *Certiorari* was allowed to review the latter determination and award.

The record is voluminous, consisting of just under 800 pages of testimony. The facts may be summarized as follows: Paul Bortos entered the employment of the chemical company in August, 1933, and continued therein until September 1st, 1934, when, at about 2 o'clock in the afternoon, he dropped dead. The company is a manufacturer of chemicals and among other products it manufactures a substance known as Di-Ortho-Tolyl-Guanidine, commonly known as and hereinafter referred to as DOTG. It is a white powder used as an accelerator in the manufacture of rubber.

The theory of petitioner's case was that the decedent was exposed to physical contact with DOTG; that it contains benzene, its homologues or derivatives and that from this contact over a period of time, the decedent developed chronic benzene poisoning. In support of its case, petitioner called Dr. Alexander O. Gettler, a professor of chemistry and toxicologist in the office of the chief medical examiner in New York City. Dr. Gettler, who is not the holder of a medical degree, testified that "the cause of death was due to the DOTG." The theory upon which he based this opinion was that DOTG "breaks up in the human body;" that it "hydrolyzes and produces toluene which is a toxic substance." Dr. Gettler's statement that DOTG hydrolyzes quite readily was somewhat qualified at a later point in his testimony when he said that "DOTG could be hydrolyzed, and how fast it hydrolyzes in the human body I cannot say, because there are no experiments on record thus far to show how fast a substance hydrolyzes within the body." He had never hydrolyzed DOTG nor had he ever heard of anyone who did, nor did he know of any authority that it could be done. He also testified that DOTG could be decomposed but he did not explain how that decomposition took place within the human body. Dr. Andrew C. Ruoff, in answer to a hypothetical question, gave it as his opinion "that the man's exposure to this particular chemical over the period which is numerated in the hypothetical question was the provocative cause of his ultimate demise or death." Dr. Rocco M. Nittoli, in answer to a similar hypothetical question, stated that the decedent "had and was suffering from DOTG poisoning."

The hypothetical question which brought forth these answers from Drs. Gettler, Ruoff and Nittoli incorporated, among other facts, that the decedent was employed in the DOTG department from August, 1933, until August 31st, 1934, which it will be noted is a period of about one year. The reason for the inclusion in the hypothetical question of a history of protracted exposure to DOTG is found in the testimony of three fellow-employees that the decedent continuously worked in the DOTG department for periods variously testified to as five to ten months before his death. The records of the company showed that the company *commenced* the manufacture of DOTG on March 15th, 1934, but five and a half months prior to decedent's death, and that the decedent worked in contact with DOTG or in contact with Accelerator 49, of which DOTG is a constituent, during eleven days in March, 1934, seven and a half days in April and on May 1st and thereafter from August 14th up to the date of death on September 1st, 1934. The facts as to the dates when the decedent worked in DOTG were substantiated by the works manager of the chemical company, under whose supervision the records were kept, and by the head of the DOTG department, and by the foreman of the same department. The testimony of decedent's fellow-employees as to the period that decedent worked in the DOTG department does not carry the same weight as the records of the company, corroborated by the testimony of its works manager and by the foreman and the head of the DOTG department. On the one hand we have the records of the company corroborated by the testimony of employees occupying positions of responsibility and charged with responsibility for the accuracy of information upon which those records were made; on the other hand the fellow-workers of decedent had no reason to charge themselves with accurate knowledge of how long or how short a time decedent was employed in the DOTG department. The records were made up contemporaneously with the events, whereas the testimony of the fellow-employees was given about two years subsequent thereto. We find that decedent's exposure to DOTG took place between the middle of March, 1934, and the date of his death and that the total thereof was thirty-four and a half working days.

On September 1st, 1934, the decedent dropped dead. On the same date, Dr. Brokaw, the county physician of Union County, performed an autopsy and found "a clot in the branches of the left coronary artery" and removed the left coronary artery or the major part thereof. He also removed the brain, kidney, liver, spleen, the stomach and its contents and sent them to Dr. Albert E. Edell, a toxicologist, for examination. Dr. Brokaw gave it as his opinion that Bortos died of coronary disease. Dr. Roman Schweizer, who took notes at the autopsy and who made observations of his own, testified to the finding of an obstruction in one of the coronary arteries and testified that the portion of the artery containing the blood clot was removed by Dr. Brokaw. His opinion was that Bortos died from coronary thrombosis. On April 23d, 1935, almost eight months after death, Bortos' body was exhumed and a re-autopsy was performed by Dr. Arthur Casilli. He testified that his finding indicated "a normal heart, that there was no coronary occlusion as far as I could make out." He also testified that Bortos did not die of coronary occlusion and that the absence of a portion of the coronary would make no difference in his conclusion. The first statement quoted above that there was no coronary occlusion *so far as Dr. Casilli could make out,* does not conflict with the definite statement of Dr. Brokaw and Dr. Schweizer that there was a coronary occlusion or thrombosis, but we fail to understand the doctor's later statement that the decedent did not die from a coronary occlusion when the coronary artery, or that part of it in which the thrombus or clot was lodged, had been dissected out in the prior autopsy of Dr. Brokaw and therefore Dr. Casilli never saw it. Dr. Casilli found no affirmative evidence that Bortos died as the result of any specific or identifiable cause.

Dr. Albert E. Edell, a chemist and toxicologist of thirty-five years' experience, made a complete toxicological examination for volatile and non-volatile organic poisons and metallic poisons of the organs which were delivered to him by Dr. Brokaw, and the result of his examination disclosed no toluene, benzine or DOTG, and the tests which he made would have disclosed their presence had they been there.

Our duty is to examine the records, appraise the proofs and determine the question of fact. *Kuropata* v. *National Sugar Refining Co.,* 126 *N. J. L.* 44. While this court will not lightly disturb the result reached by two lower tribunals, nevertheless, where, on a consideration of a given case, we conclude that the lower tribunals have found the facts incorrectly, it is our duty to correct the error. *Lazzio* v. *Primo Silk Co.,* 114 *Id.* 450; *affirmed,* 115 *Id.* 506.

Our examination and study of this case brings us to a conclusion that the petitioner has failed to establish that decedent's death was due to a compensable occupational disease, and we conclude that the prosecutor has sustained the burden of proving that decedent died of coronary occlusion, and that there was no proof of a causal connection between the coronary occlusion and decedent's contact with DOTG.

The judgment of the Union County Court of Common Pleas is reversed, with costs.